Judy SABIR, et al., Appellants/Cross–Appellees,

v.

DISTRICT OF COLUMBIA, et al., Appellees/Cross–Appellants.

Nos. 98–CV–628, 98–CV–699.

District of Columbia Court of Appeals.

Argued March 28, 2000.

Decided June 22, 2000.

---

George L. Garrow, Jr., Washington, DC, for appellants/cross-appellees.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Robert E. Rigsby, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellees/cross-appellants.

Before STEADMAN and REID, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

This litigation stems from the arrest of appellant Judy Sabir and the related detention of Karramah Taylor by officers of the Metropolitan Police Department. When the criminal charges were dismissed, appellants filed a civil action, with multiple counts, against the District of Columbia and the officers. Appellants appeal from adverse directed verdicts against them; the District also appeals from the refusal of the trial judge to vacate a judgment based on a jury verdict against it. We affirm.

## I.

### A.

At approximately six o'clock on the evening of January 7, 1992, appellants Judy Sabir and her daughter, Karramah Taylor, left their home on Fifth Street, Northeast, and began walking to a nearby store. They noticed a car traveling past them at a slow speed. Two police officers were in an unmarked police car with police tags. Appellants walked through an abandoned school yard to reach the store. Sabir and

Taylor were about twenty-five feet away from each other at the time. A short time earlier, Detectives James Minar and Dean Welch received a radio run for an armed robbery. The suspects included one black male juvenile and one black female juvenile, armed with a knife, wearing dark jackets and dark colored clothing. Within fifteen minutes of the lookout, six to ten blocks from the scene of the robbery, they saw Taylor. The officers observed that she was a juvenile, black, and was wearing dark clothing. After following Taylor and Sabir for a short time, the officers requested that Taylor approach the car; she refused. Detective Minar exited the police car and approached Taylor. Although he was in plain clothing, he displayed his police badge on his belt. According to the testimony of Minar, he identified himself as a police officer when he requested that Taylor stop, and again after Taylor took a few steps. Taylor denies that the officer identified himself. Minar asked Taylor twice to remove her hands from her pockets, but she refused. Minar then removed Taylor's hands from her pockets.

Sabir, observing the exchange between Taylor and Minar, jumped on Minar from behind. According to Minar's testimony, Sabir struck him in the back and on his side. Sabir testified that she struggled with Minar and Welch for a couple of seconds before they handcuffed her. Sabir testified that Minar placed her in a choke hold and pushed her head into a gate. According to Minar, in order to restrain her, Welch grabbed one arm while Minar grabbed the other arm, and attempted to place them behind her back. Both officers denied applying a choke hold to Sabir. Sabir also testified that during the arrest she informed the officers that she had a bad neck and back. Minar testified that during the struggle, neither Sabir nor Taylor said that Sabir had any physical problems.

Subsequently, the victim of the robbery was brought to the scene, but did not identify Taylor as the robber. Taylor was released by the officers. Sabir was arrested for assaulting an officer and was transported to the police precinct station. Sabir's physician visited her while she was in custody at the police station, but did not examine her. On the day following the incident, January 8, 1992, Sabir saw the doctor again. He concluded that her neck had been destabilized as a result of the struggle. The assault charges against Sabir were eventually dismissed by the government.

### B.

Following the incident, Sabir and Taylor filed a complaint in the Superior Court on January 6, 1995, asserting multiple causes of action against the District and the officers. The complaint included three negligence claims alleging: negligence by the officers in the seizure and arrest of appellants; negligence by the District in the custody and transportation of appellant Sabir; and negligence by the District under the doctrine of *respondeat superior*. The remaining claims against the police officers and the District were premised on violation of a federal statute, 42 U.S.C. § 1983, alleging excessive force in effectuating Sabir's arrest and unlawful detention of Taylor.

At the close of evidence at trial, the court granted a directed verdict for the District of Columbia on the initial negligence claim against the police officers, concluding that "the negligent assaulting of someone based strictly on a negligence theory" did not constitute a valid cause of action. A directed verdict was also granted in favor of the District on the negligent custody and transportation claim. Appellants appeal both of these rulings. At the close of the evidence appellants voluntarily dismissed their claim of negligence against the District based on *respondeat superior*. The court merged the § 1983 action against the District of Columbia with the § 1983 action against the police officers. Appellees moved for a directed verdict on the § 1983 action for use of excessive force

against Sabir and unlawful detention of Taylor. This was denied and the claims went to the jury. Sabir was awarded $25,000 in compensatory damages, without punitive damages, and Taylor was denied any recovery. Appellees cross appeal the denial of their post-trial motion for a judgment on the § 1983 action as to Sabir.

## II.

Appellants' primary challenges in this appeal relate to the directed verdicts granted against them, at the close of all the evidence, as to two of their claims of negligence. Both appellants contest the adverse rulings against them relating to their alleged negligent apprehension; appellant Sabir also contests the dismissal of her claim of negligent custodial behavior and transportation of her.

 In determining whether the trial court erred in directing a verdict, the evidence must be viewed in the light most favorable to the nonmoving party, who must be given the benefit of all reasonable inferences to be drawn from the evidence. *Abebe v. Benitez*, 667 A.2d 834, 836 (D.C. 1995); *see Washington Metro. Area Transit Auth. v. Jones*, 443 A.2d 45, 49 (D.C. 1982) (en banc); *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1263 (D.C.1979). A directed verdict may be granted " '[o]nly where the probative facts are undisputed and where reasonable minds can draw but one inference from them.' " *Aylor v. Intercounty Constr. Corp.*, 127 U.S.App.D.C. 151, 155, 381 F.2d 930, 934 (1967) (quoting *Capital Transit Co. v. Bingman*, 94 U.S.App.D.C. 75, 76, 212 F.2d 241, 242 (1954)). Where "the case turns on controverted facts and the credibility of witnesses, the case is peculiarly one for the jury." *Id.* Applying these basic principles, we are persuaded that no reasonable jury could find that the police officers were negligent during the incident in question.

## A.

As we have said in *McCracken v. David Walls–Kaufman*, 717 A.2d 346 (D.C.1998)

(reiterating that the same course of conduct may give rise to claims of both assault and negligence if the necessary predicates for both are shown), and earlier cases, while it is true that one incident may give rise to claims of intentional tort or negligence, these are separate theories of liability which must be presented individually and founded on appropriate evidence. In other words, a plaintiff cannot seek to recover by "dressing up the substance" of one claim, here assault, in the "garments" of another, here negligence. *See United Nat'l Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir.1993).

 According to appellants' complaint, the police officers "negligently caused the assault and battery, arrest and detention of plaintiffs." Prior to rendering a directed verdict the trial court stated, "you can't convert an intentional tort to a negligence cause of action." If appellants had plead intentional tort (assault and battery), and in the alternative, negligence, the court could have addressed each count separately, allowing for a finding of liability under either theory. *See Holder v. District of Columbia*, 700 A.2d 738 (D.C. 1997) (two legal causes of action went to the jury—negligence and assault and battery); *District of Columbia v. White*, 442 A.2d 159 (D.C.1982) (both counts of negligence and assault were submitted to the jury). Appellants however combined these two theories into a single cause of action, in essence pleading a nonexistent cause of action. "There is no such thing as a negligent assault." 1 F. Harper & F. James, The Law of Torts, § 3.5 at 3:19 (3d ed.1996). In order to find liability for assault or battery it "is necessary that the defendant either have intended to commit a battery or to cause in the plaintiff an apprehension of a battery." *Id.* at 280. *See* Restatement (second) of Torts, § 18 (battery) and § 21 (assault) (1965). Thus it is settled that a person cannot negligently commit an intentional tort.

Notwithstanding appellants' counsel's belated attempt to offer alternative theories in place of the one cause of action set forth in the complaint, appellants "specify no negligent act, and fail to characterize the breach of duty which might have resulted in negligence liability." *Maddox v. Bano,* 422 A.2d 763, 764 (D.C.1980). Viewing the evidence in the light most favorable to appellants, the nonmoving parties, the trial court did not err in directing a verdict in favor of appellees on the claim of "negligent assault." No reasonable jury could have found in favor of appellants on these claims.

## B.

█ It is also appellant Sabir's contention that the District was negligent in the transportation and custody of her. This claim was described in the complaint as a failure to promptly "treat Ms. Sabir's injuries and [allowing] her to become further injured while transporting her from the scene of the incident to the police station." During trial appellant's counsel asserted negligence involving the improper use of the handcuffs causing injury to Sabir. However, appellant provided scant evidence to show that the arresting officers, in taking her into custody and transporting her, deviated from a standard of ordinary care owed to her under the circumstances. Similarly, there is no evidence supporting appellant's claim that the police officers were inadequately trained, thus causing them to subject Sabir to injury. Again applying the appropriate litmus to the directed verdict ruling, we find that the trial court did not err in granting this directed verdict in favor of appellees. Viewing the evidence and all inferences drawn therefrom in a light most favorable to appellant, no reasonable juror could find negligence on this theory of the case.

## III.

█ The District contends the trial judge erred in declining to vacate the jury's verdict in favor of appellant Sabir on the basis of her § 1983 claim. The District argues, as a matter of law, its officers were protected by qualified immunity.

## A.

█ Broadly speaking, government officials, including police officers, are protected from liability in civil actions under the doctrine of qualified immunity. 42 U.S.C. § 1983. The privilege of qualified immunity is rooted in the seminal case of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Harlow* states, "[g]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... rights of which a reasonable person would have known." *Harlow, supra,* 457 U.S. at 818, 102 S.Ct. 2727. In a significant decision, *Anderson v. Creighton,* 483 U.S. at 636, 107 S.Ct. 3034 (1987), the court made clear that qualified immunity can be applied to the behavior of law enforcement officers in the context of the Fourth Amendment. Utilizing decisions related to arrests, detentions and searches, the court has afforded protection from liability in a civil action if the officer's behavior is objectively deemed reasonable under the circumstances. *See Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Slattery v. Rizzo* 939 F.2d 213 (4th Cir.1991). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight." *Id.* at 397; *see Terry v. Ohio,* 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Any subjective beliefs and intents held by police officers are irrelevant to the defense of qualified immunity. *Anderson, supra,* 483 U.S. at 641, 107 S.Ct. 3034. The crux of the inquiry is "whether the force applied was reasonable." *Wardlaw v. Pickett,* 303 U.S.App.D.C. 130, 1 F.3d 1297, 1303 (D.C.Cir.1993).

This court has specifically addressed the issue of qualified immunity in the context of § 1983 claims for excessive use of force. "The law now ... is that the official must intentionally, or with reckless disregard, violate a clearly established right before a § 1983 claim is justified." *District of Columbia v. Evans,* 644 A.2d 1008, 1017 (D.C.1994) (officers involved in shooting death of citizen were protected under qualified immunity); *See also District of Columbia v. Minor,* 740 A.2d 523, 530 (D.C. 1999). This protection enables officers to do their job without "the burdens and uncertainties of standing trial in those instances where their conduct would strike an objective observer as falling within the range of reasonable judgment." *Evans, supra,* 644 A.2d at 1015, *citing Gooden v. Howard County,* 954 F.2d 960, 965 (4th Cir.1992). Absent violation of "a clearly established right,"a police officer will not be subject to § 1983 liability. *Id.* at 1015. As the D.C. Circuit articulated the standard in *Wardlaw v. Pickett, supra,* "a defendant's motion for summary judgment [based on qualified immunity] is to be denied only when, viewing the facts in the record and all reasonable inference derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Id.* at 136, 1 F.3d at 1303.

### B.

In this case, counsel for the District did not raise the question of immunity as to the § 1983 claim until all evidence had been presented. While there was mention of immunity in a pretrial statement, the District did not pursue the question until the close of trial. Even then the matter was raised in an imprecise and piecemeal fashion. The judge denied the motion. Later a written comprehensive motion, filed after the jury's verdict, requested that the jury's verdict be vacated. The judge again denied relief.

The record reflects that during direct examination Sabir testified to the following regarding force exerted against her by the police officers:

Q. Now, how were they grabbing you, Ms. Sabir?

A: One had me around like this, like this.

Q: Are you saying like a choke hold?

A: Yes, it was a choke hold.

Q: Like this?

A: Mm-hm.

Q: Okay, let me understand. Are you saying that he grabbed you from behind?

A: Yes.

. . . .

During cross examination Sabir again testified regarding the alleged use of a "choke hold" by the officers:

Q: Now, you said yesterday when these officers went to restrain you they placed you in a choke hold. Is that right?

A: Correct

Q: And when your attorney asked you to demonstrate that, you put up your hands in front of your body crossed like this. Is that right?

A: Yes.

Q: Okay, and so what you are saying then is that a police officer grabbed you from behind and when he did so he had his hands crossed like that. Is that right?

A: Across like that.

. . . .

The expert witness, Robert Klotz, testified on behalf of appellant regarding the types of force used by police officers during arrests. He also gave testimony regarding the applicable national standard of care for police officers. Klotz testified as follows:

Q: So based on your testimony, within a reasonable degree of professional certainty, did Detective Minar and Welch's actions as described here violate the standard of care?

A: It's my opinion that they did.

Q: Do you have an opinion as to the use of a choke hold in a street situation?

A: The choke hold and the one they call the bar hold, which actually goes across the throat and cuts off the air—[1]

Q: Straight across the neck?

A: —where its impacting on the windpipe and it cuts off the air. As far as the District is concerned, the city council in the District of Columbia passed an ordinance forbidding officers to use choke holds back in 1985. The city council when it passed the legislation barring choke holds said that police officers could use the carotid hold but only in very limited circumstances ...

Q: So, in other words, what you're saying is that the bar hold can't be used at all?

A: That's correct.

. . . .

### C.

■ In reviewing the record of appellant Sabir's testimony, it is apparent that, in large part, she demonstrated her version of the manner in which she was apprehended. Generally, the review of a denial of qualified immunity is a question of law—"whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In *Fulwood v. Porter,* 639 A.2d 594 (D.C.1994), this court relied upon the Supreme Court's ruling in *Mitchell* to answer the question whether the trial court or jury ultimately decides the issue of

qualified immunity. Any facts disputed by the parties regarding the issue of immunity are submitted to the trier of fact, but the "purely legal question on which [the] claim of immunity turns," *Mitchell, supra,* 472 U.S. at 530, 105 S.Ct. 2806, remains an issue for the court. "Although the qualified immunity determination is a legal question, it is not answered in the abstract but in reference to the particular facts of the case." *Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir.1988); *See also Green v. Carlson,* 826 F.2d 647, 649 (7th Cir. 1987). In some cases the factual issues, if disputed, need to be resolved by the trier of fact prior to the court determining whether qualified immunity will serve as a defense.

In assessing the trial judge's ruling, we are obliged to view appellant's factual assertions in their most favorable light, and consider whether any reasonable officer could have believed in the lawfulness of his actions. *See Wardlaw, supra,* 1 F.3d at 1303; *see also Washington v. A & H Garcias Trash Hauling Co.,* 584 A.2d 544, 545 (D.C.1990). It is significant that, on this record, we do not know the specific nature of appellant Sabir's demonstrations in court relating to the officers' use of force. Certainly the judge and jury heard her testimony and observed her reenact what she said occurred. In response to a leading question, appellant Sabir described the force exerted by the police officers as a "choke hold" and demonstrated it. The District's counsel did not clarify the matter.

We also observe that the government did not assert its immunity defense until the close of the case when the judge was preparing his instructions to the jury. Counsel for the District argues in this court that the issue was indeed raised in the trial court. That is so; however, the record shows that the defense was ad-

---

1. The "choke hold" is technically referred to as the "bar hold," a hold where the arm is "straight across [the neck] where it's impacting on the windpipe and it cuts off the air." According to the expert witness the only acceptable type of hold is the carotid hold which involves "more of an angular hold, which compresses the carotid artery...."

vanced orally, accompanied by the citation of some cases, and a promise to supply additional authority. The District filed its written, more comprehensive motion after the trial. In this posture, and relying on an incomplete record as to the specifics of the altercation between appellant Sabir and the officers, appellee urges that we vacate the judgment as a matter of law.

We are not inclined to disturb the trial court's ruling. A clearer, more timely presentation of the government's position, preferably in writing, was necessary to get the full force of its argument in the trial court. Similarly, in a question of this significance, care must be taken that the record reflect the critical facts. In the absence of such a record, we must defer to the judge's first-hand view of the witnesses and his ruling that the actions of the police officers were beyond the scope of qualified immunity protection. *See Doe v. Georgetown Center II, Inc.,* 708 A.2d 255, 256 (D.C.1998) (stating that we must give deference to the judge who has had the opportunity to observe the witnesses and consider the evidence in the context of a living trial rather than upon a cold record); *Ahmad Mahallati v. Williams,* 479 A.2d 300, 304 (D.C.1984). We therefore decline to reverse the ruling of the trial court.

### CONCLUSIONS

We uphold the trial judge's rulings adverse to appellants, and decline to vacate the judgment rendered against appellee.

*Affirmed.*